**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CORNELL HESTER,<br><br>*Plaintiff,*<br><br>v.<br><br>OFFICER DENNIS GIBSON,<br><br>*Defendant.* | Civil Action No. 1:23-cv-4086 (RMB-SAK)<br><br>**OPINION** |

**BUMB,** Chief District Judge.

**THIS MATTER** comes before the Court on the motion of Defendant Officer Dennis Gibson ("Officer Gibson") for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 63.) Plaintiff Cornell Hester ("Plaintiff"), a former New Jersey state prisoner, alleges that Officer Gibson — a corrections officer then assigned to the A-Unit of Bayside State Prison ("BSP") — facilitated an assault upon him by three fellow incarcerated persons ("IPs") inside his locked cell on January 10, 2022. Plaintiff's operative Third Amended Complaint ("TAC," ECF No. 44) asserts claims against Officer Gibson under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-1 *et seq.*, for (i) deliberate indifference to Plaintiff's safety in violation of the Eighth Amendment (Counts I and II), and (ii) violation of Plaintiff's substantive due process rights under the Fourteenth Amendment (Counts III and IV).

The motion has been fully briefed. (ECF Nos. 63, 64, 67, 70.) The Court has considered the parties' submissions and decides the motion on the papers, without oral argument, pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b).[1]

For the reasons that follow, Defendant's motion is **GRANTED IN PART and DENIED IN PART**.

## I. BACKGROUND

### A. Procedural History

Plaintiff commenced this action *pro se* on July 31, 2023. (ECF No. 1.) Along with an application to proceed *in forma pauperis* (ECF No. 3), Plaintiff filed a motion to appoint *pro bono* counsel (ECF No. 4), a motion to suppress evidence (ECF No. 5), a motion to supplement the complaint (ECF No. 6), a proposed Amended Complaint (ECF No. 7), and a motion to admit exhibits (ECF No. 8). Following administrative termination and reinstatement of the matter, the Court, by Order and Memorandum Opinion dated January 4, 2024, granted Plaintiff's renewed application to proceed *in forma pauperis*, filed the Amended Complaint, and permitted Plaintiff's Eighth Amendment failure-to-protect claim against Officer Gibson to proceed while

[1]Portions of the parties' Rule 56.1 statements and supporting exhibits concerning Plaintiff's medical records have been provisionally redacted and filed under seal, pending resolution of Defendant's motion to seal. (ECF No. 71.) The Court's discussion of that evidence below is limited to what appears on the public docket and does not rely on, or disclose, the redacted material.

dismissing Plaintiff's remaining claims against since-terminated co-defendant New Jersey Department of Corrections on initial screening. (ECF Nos. 12, 13.) The Court denied without prejudice Plaintiff's motion for *pro bono* counsel, denied as premature his motions to suppress evidence and admit exhibits, and dismissed his motion to supplement the complaint as moot. (*Id.*)

Plaintiff moved for summary judgment on March 25, 2024 (ECF No. 17); the Court denied that motion without prejudice by Order and Memorandum Opinion dated September 11, 2024. (ECF Nos. 21, 22.) Plaintiff's renewed request for *pro bono* counsel (ECF No. 19) was denied without prejudice on August 9, 2024. (ECF No. 20.) Attorney Peter Kober entered an appearance on Plaintiff's behalf on October 1, 2024 (ECF No. 23), and, with the assistance of counsel, Plaintiff filed a Second Amended Complaint on December 20, 2024 (ECF No. 28), which Officer Gibson answered on January 10, 2025 (ECF No. 30).

On July 2, 2025, the Court granted Plaintiff leave to file the operative TAC (ECF No. 43), which was filed that same day (ECF No. 44) and reasserts Plaintiff's Eighth Amendment and NJCRA claims (Counts I and II) while adding claims for violation of substantive due process under the Fourteenth Amendment and NJCRA (Counts III and IV). Officer Gibson answered the TAC on July 24, 2025. (ECF No. 46.) Fact discovery closed on November 14, 2025. (ECF No. 56.) Officer Gibson filed the instant motion for summary judgment on February 23, 2026 (ECF No. 63), which

Plaintiff opposed on April 6, 2026 (ECF No. 67), and to which Officer Gibson replied on April 27, 2026 (ECF No. 70).

## B. Factual Background

The following facts are drawn from Defendant's Statement of Undisputed Material Facts ("Def. SUMF," ECF No. 63-3), Plaintiff's Response thereto ("Pl. Resp. SUMF," ECF No. 67-1), Plaintiff's Statement of Disputed Material Facts ("Pl. SDMF," ECF No. 67-2), and Defendant's Response to Plaintiff's Statement of Disputed Material Facts ("Def. Resp. SDMF," ECF No. 70-4), together with the exhibits and declarations those statements cite. Consistent with the summary judgment standard discussed in Part II below, the Court recites the undisputed facts as such and identifies genuine disputes where they exist. Where the parties' accounts diverge, the Court has not resolved credibility but has instead set forth each side's version.

### *1. The A-Unit and Officer Gibson's Shift Assignment*

Plaintiff arrived at BSP in April 2021 and, prior to January 10, 2022, was housed on the A-Unit. (Pl. SDMF ¶ 1.) Unit practice included three daily recreation periods, during which inmates could use the outdoor recreation yard, the shower, or the telephone; inmates not doing so were returned to their cells, and cell doors were opened and closed by the officer stationed at the console in the Unit's control booth, referred to by the parties as the "bubble." (*Id.* ¶¶ 2–10.) Outside of recreation, meal

movements, and scheduled appointments, inmates were not authorized to leave their cells, to enter another inmate's cell, or to move freely about the tier — with one exception, discussed below, for certain inmate workers. (*Id.* ¶¶ 11–16.)

The parties dispute which shift Officer Gibson worked on the Unit, a fact bearing on his opportunity to have been present for events described below. Officer Gibson's declaration states that he was assigned to BSP's second shift (2:00 p.m. to 10:00 p.m.) on January 10, 2022, and had worked that shift for approximately two years; because lunch service typically ran from 12:00 p.m. to 12:45 p.m., before the start of second shift, Officer Gibson avers that he does not recall working lunch service that day or at any time in the two years prior while on second shift, and does not recall Plaintiff making any complaint about the number of hot dogs he received. (Gibson Decl. ¶¶ 4–8; Def. SUMF ¶¶ 4–8.) Plaintiff disputes this, testifying that Officer Gibson "would normally work the first shift on the Unit," which included the morning and lunch hours. (Pl. Resp. SUMF ¶¶ 5, 7; Pl. SDMF ¶ 23 (each citing Hester Dep. T41:1–8).)[2] Defendant objects that Plaintiff lacks personal knowledge of Officer Gibson's shift assignment and that the testimony amounts to speculation, and separately disputes the

[2]The deposition excerpt in the record at ECF No. 67-3 does include page 41, but lines 1–8 there concern Officer Gibson's authority over pantry-worker assignments, not his shift schedule; the Court could not locate testimony matching this citation within the excerpt provided. The underlying premise is not without any record support, however: Plaintiff's interrogatory answers separately and independently assert that Officer Gibson supervised the pantry workers "on 1st shift." (Def. Ex. J, Interrog. Resp. No. 15.) The complete deposition transcript is not part of the record before the Court, and the Court does not rest any part of its disposition on the specific citation.

substance, reiterating that Officer Gibson worked second shift. (Def. Resp. SDMF ¶ 23.)

### *2. IPs Brown, Lee, and Kareem*

Also housed on the A-Unit were IPs Levi Brown, Donald Lee, and Ryan Kareem, who were assigned as the Unit's pantry workers responsible for lunch service and who also performed mopping and sweeping duties on the tier. (Pl. SDMF ¶¶ 17–20.) Plaintiff testified that Brown, Lee, and Kareem were, as a result of these assignments, the only inmates on the Unit permitted to move freely about the tier and dayroom and to be in otherwise unauthorized areas, and that Officer Gibson was the one who selected them for these roles and allowed them this latitude. (*Id.* ¶¶ 21–22, 25–26.) Defendant disputes that Officer Gibson selected Brown, Lee, or Kareem for any assignment or permitted them to do as they wished outside their cells, citing a supplemental declaration submitted with the reply. (Def. Resp. SDMF ¶¶ 24–26 (citing Supplemental Declaration of Dennis Gibson ("Suppl. Gibson Decl.") ¶¶ 6, 9).) Plaintiff further testified that he had heard more than five other inmates say that Officer Gibson selected inmates he disliked to be assaulted and sent Brown, Lee, and Kareem to carry out those assaults. (Pl. SDMF ¶ 30.) Separately, Plaintiff testified that he had personally seen the three enter another inmate's cell and assault its occupant on a prior occasion. (*Id.* ¶ 31.) Defendant does not dispute that Plaintiff so testified but contends the former — what Plaintiff says other inmates told him — is inadmissible

hearsay to the extent offered to prove that Officer Gibson in fact operates such a scheme, a point addressed in Part III.A below.

### *3. The Hot Dog Dispute and Alleged Harassment*

The parties agree that, at some point before the incident giving rise to this suit, a dispute arose during lunch service after Plaintiff was served one hot dog rather than his allotted two. The parties' accounts diverge as to timing and character. In statements each gave to the Special Investigations Division ("SID") of the New Jersey Department of Corrections shortly after January 10, 2022, Plaintiff, Lee, and Brown each described the dispute as having arisen *that day* — that is, during lunch service on January 10, 2022 itself — with Lee and Brown each stating that Plaintiff asked them to come to his cell afterward to discuss it. (Def. SUMF ¶¶ 32, 34, 36.) Plaintiff's operative statement of facts, prepared later in this litigation, instead places the hot dog dispute at some point *prior to* January 10, 2022, and describes the resulting friction with Officer Gibson as ongoing. (Pl. SDMF ¶¶ 32–33; Pl. Resp. SUMF ¶ 32 (disputing that the SID interview confirms the dispute occurred "that day").)

As to the dispute itself, Plaintiff testified that he told the inmate serving lunch — one of Brown, Lee, or Kareem — that he had received only one hot dog rather than two; that Officer Gibson approached and asked what was going on; that Plaintiff told him; and that Officer Gibson, angry, ordered Plaintiff to keep moving and return to his cell, stating that lunch was over. (Pl. SDMF ¶¶ 34–37.) Plaintiff further testified that Officer Gibson thereafter routinely harassed him, telling him "I don't like you and

I'm going to get you" beginning within a month of Plaintiff's 2021 arrival at BSP. (*Id.* ¶¶ 38–40.) Defendant disputes that Officer Gibson was present for or responded to any such complaint, and Officer Gibson has separately and specifically denied the alleged threats — averring that he "never harassed or threatened Plaintiff," never told him he "did not like him," and never told him he was "going to get" him. (Suppl. Gibson Decl. ¶¶ 10–12.) Neither side's account of the alleged threats is corroborated or refuted by the camera footage, which carries no audio. (Def. Resp. SDMF ¶¶ 34–40; Pl. Resp. SUMF ¶ 26 ("No audio is heard on the tier cameras to confirm that Officer Gibson is being truthful about this encounter with Hester.").)

#### ***4. The January 10, 2022 Cell Incident***

The parties' evidence, including silent video surveillance footage from multiple fixed cameras, establishes the following sequence of events on the afternoon of January 10, 2022, and the parties do not dispute the timestamps themselves, only their significance. Afternoon recreation began at 13:25 hours. (Def. SUMF ¶ 9.) At 13:31:52, IP Lee approached Plaintiff's cell door and departed ten seconds later. (*Id.* ¶ 10; Pl. Resp. SUMF ¶ 10 (agreeing, and characterizing this as Lee "casing" Plaintiff's cell).) At 13:32:42, Lee was seen on video speaking with Officer Gibson in the Unit dayroom — an encounter Defendant's evidence places at six seconds or less and Plaintiff characterizes as evidence of coordination. (Pl. SDMF ¶ 47; Def. Resp. SDMF (Reply) at 6–7 (citing Dayroom Camera (back 3) and (front door) at 13:32:30–13:32:41).)

Plaintiff's cell door opened at 13:34:56. (Def. SUMF ¶ 11; Pl. SDMF ¶ 48.) The parties agree that neither Plaintiff nor his cellmate had an appointment that would have authorized the door to be opened at that time, and that the door is controlled from the bubble, approximately twenty to thirty feet from Plaintiff's cell. (Def. SUMF ¶ 12; Pl. SDMF ¶¶ 43, 45–46.)

The parties' evidence as to Officer Gibson's location at that moment draws on two different camera systems that, as Defendant's SUMF discloses without contradiction from Plaintiff, run on clocks approximately two minutes apart: fixed tier cameras, and separate dayroom and control-booth cameras that run roughly two minutes behind the tier cameras. (Def. SUMF ¶ 18 & n.1.) Applying that offset, Defendant's evidence — drawn from the dayroom cameras — places Officer Gibson standing outside the bubble, with no control panel or other door-control device accessible to him, at the moment corresponding to 13:34:56; walking away over the following several seconds to unlock a separate gate; back inside the booth, with another IP nearby, as IPs Lee and Brown entered Plaintiff's cell; stepping out of the booth to speak with two other officers elsewhere in the dayroom during part of the time the IPs were inside; and back in the booth, with IPs again nearby, in the roughly thirty seconds before Plaintiff and the three IPs emerged. (*Id.* ¶¶ 18–22.) Defendant points to this same footage, spanning the full interval, as showing no one in Officer Gibson's vicinity reacting as though they had overheard him yelling. (*Id.* ¶¶ 23–24.)

Plaintiff, for his part, testified that Officer Gibson was in the bubble at the control panel at the moment the door opened, that Officer Gibson was the one who operated the panel to open it, and that Plaintiff saw Officer Gibson standing at the panel when he looked toward the bubble upon walking to his open cell door immediately afterward. (Pl. SDMF ¶¶ 49–51 (citing Hester Dep. T68:18–23; T69:6–16; T71:14–18; T116:6–18; T117:2–7; T121:16–25; T122:1; T123:3–16).) Plaintiff's SDMF further asserts that "[v]ideo evidence confirms" Officer Gibson was at the panel at the moment of the door's opening, citing Defendant's own SUMF ¶ 22. (Pl. SDMF ¶ 52.) But ¶ 22, like the paragraphs around it, describes dayroom-camera footage timestamped 13:34:17 to 13:34:44, which — once the undisputed two-minute offset is applied — corresponds to a period roughly two minutes *after* the door opened, not the moment itself. Defendant disputes that Officer Gibson personally or purposely opened the door, reasserts that the dayroom footage places him outside the bubble at the relevant moment, and notes that other cell doors on the Unit can be seen opening at around the same time, consistent with ordinary recreation-period movement. (Def. Resp. SDMF ¶¶ 49–52; Def. SUMF ¶ 13.)

IPs Lee and Brown entered Plaintiff's cell at 13:35:10; IP Kareem entered at 13:35:47; and Plaintiff and all three IPs began exiting the cell at 13:36:44. (Def. SUMF ¶¶ 14–16; Pl. SDMF ¶¶ 53–54, 57, 61 (agreeing as to each timestamp).) No camera captures the interior of the cell. Plaintiff testified that, once inside, Brown and Lee punched him in the face, slammed him, stomped on him, and kicked him, and that

Kareem, upon entering, choked him to the point of unconsciousness — testimony Defendant does not dispute for purposes of this motion and that Defendant's own examination of Plaintiff elicited in materially the same terms. (Pl. SDMF ¶¶ 55, 59; Def. Resp. SDMF ¶¶ 55, 59 (agree); Def. Ex. H at 78:8–15.) Plaintiff's cellmate, Rajeer Peterson, who was present, told SID investigators there was "fighting" in the cell, which he later in the same interview described as "tussling" without punching, and told SID he could not identify the assailants and had no reason to believe an officer had opened his cell door. (Def. SUMF ¶¶ 38–39; Pl. SDMF ¶ 56.)

Plaintiff further testified that, while the assault was underway, he believed he heard a voice from out on the tier, which he identified as Officer Gibson's, shouting "hurry up, hurry up, fuck him up." (Pl. SDMF ¶ 60.) Defendant disputes this. Officer Gibson's declaration denies directing the IPs to attack Plaintiff, instructing them to "hurry up" or "fuck him up," or taking any action to facilitate an attack, and Defendant's evidence is that at no point during the relevant interval does the (silent) surveillance footage show Officer Gibson yelling or calling out, or show anyone in his vicinity reacting as though they had overheard him doing so. (Def. Resp. SDMF ¶ 60 (citing Gibson Decl. ¶¶ 17, 20–21); Def. SUMF ¶¶ 23–24.) Plaintiff separately reiterated the hearsay-based account of a broader "hit men" practice described above. (*See supra* Part I.B.2; Pl. SDMF ¶ 30.) As discussed in Part III.A.2 below, the Court agrees with Defendant that this testimony is hearsay to the extent offered for its truth.

Upon exiting the cell, Plaintiff can be seen on video breathing heavily with his chest visibly heaving, speaking and gesturing toward Brown, Lee, and Kareem in an agitated manner, and wearing a white T-shirt that is stretched with what the parties agree is a hole near the right shoulder (the parties dispute only whether blood is visible). (Pl. SDMF ¶¶ 62–64; Def. Resp. SDMF ¶¶ 62–64.) Disciplinary charges later issued against Brown and Lee likewise note, based on camera review, that Plaintiff's shirt appeared "stretched and has a tear in the front shoulder area." (Pl. SDMF ¶¶ 65–66; Def. Ex. D (Disciplinary Reports – Brown, Lee) (same quotation in the original reports).)

### *5. The Tier Altercation and Aftermath*

Plaintiff remained out of his cell and on the tier until 13:44:50, when Officer Gibson approached him and instructed him to return to his cell to be locked in; Plaintiff refused. (Def. SUMF ¶¶ 25–26.) Defendant's evidence is that Plaintiff neither reported having just been attacked nor confronted or blamed Officer Gibson during this exchange. (*Id.* ¶ 27.) Plaintiff's response to this fact is equivocal: although Plaintiff testified at his deposition that he never spoke with Officer Gibson in the aftermath of the incident, Plaintiff's counsel acknowledges that the video footage shows the two of them in conversation at 13:44:50, and maintains only that the absence of audio leaves the content of that conversation unconfirmed. (Pl. Resp. SUMF ¶ 27.)

After Officer Gibson left, Plaintiff remained on the tier until 13:47:55, when Plaintiff and IP Kareem began fighting. (Def. SUMF ¶ 28.) A Code 33 was called;

Officer Gibson responded along with other officers, oleoresin capsicum spray was deployed, and Plaintiff and Kareem were secured and taken to medical for decontamination and treatment. (*Id.* ¶¶ 29–30.) It is this second, tier-level altercation with Kareem — rather than the earlier cell incident — that Officer Gibson acknowledges directly responding to. (*See* Def. Br. (ECF No. 64) at 12–13.)

SID thereafter investigated and interviewed Plaintiff, Lee, Brown, and Peterson. (Def. SUMF ¶¶ 31–39.) Plaintiff, Kareem, Lee, and Brown were each charged with fighting; Plaintiff and Kareem were also charged with destroying government property, and Lee and Brown with being in an unauthorized area. (*Id.* ¶¶ 40–43.) Officer Gibson received no discipline in connection with the incident, a fact Plaintiff does not dispute. (*Id.* ¶ 44; Pl. Resp. SUMF ¶ 44 (agree).)

***6. Plaintiff's Account Over Time***

Defendant places substantial weight on inconsistencies between Plaintiff's contemporaneous statements and his later testimony, and the record bears this out. During his SID interview two days after the incident, Plaintiff stated that IP Kareem attempted to stab him with a metal shank; he repeated this in a January 30, 2022 administrative grievance; and at no point in either did he claim that Officer Gibson appeared at his cell or that he overheard Officer Gibson instructing his attackers. (Def. SUMF ¶¶ 45–48.) Nor does the operative TAC itself allege that Officer Gibson appeared at the cell or was overheard directing the attack. (*Id.* ¶ 49.) Plaintiff's interrogatory answers, served May 16, 2025 — several months after Plaintiff had

obtained counsel — take a different tack still: Plaintiff there stated that Officer Gibson personally "showed up at my cell" during the attack and screamed for the attackers to "fuck him up" and "hurry up," without mentioning a shank; that he had seen Officer Gibson in the bubble conversing with his three eventual attackers approximately one and one-half hours before the attack; and that "[a]nother officer" had also witnessed the attack, a claim neither party's Rule 56.1 submissions revisit. (Def. Ex. J, Interrog. Resp. Nos. 1, 7, 22.) At his August 27, 2025 deposition, Plaintiff's account shifted again on the first two points: he testified that Officer Gibson did not appear at the cell and that no shank was involved, but that he had overheard Officer Gibson yelling encouragement from the bubble, and he placed the sighting of Officer Gibson with the three IPs at 13:32:42 — roughly two minutes, not ninety, before the attack. (Def. SUMF ¶¶ 52–53; Pl. SDMF ¶ 47.) Plaintiff's opposition papers describe the overheard-encouragement claim the same way, framed in terms of what Plaintiff "believed he could hear." (Pl. SDMF ¶ 60.) The claimed orbital injury shifted sides over the same span: Plaintiff's interrogatory answers describe an injury to his left orbit, while his deposition testimony and Plaintiff's own SDMF describe his right orbital bone. (Def. Ex. J, Interrog. Resp. No. 18; Pl. SDMF ¶ 68.) Plaintiff also acknowledged at his deposition that he has no personal knowledge of any other instance in which Officer Gibson directed an IP to attack another, and that his belief that Officer Gibson has done so rests on rumor and conjecture. (Def. SUMF ¶¶ 54–55.)

### *7. Plaintiff's Alleged Injuries*

Immediately following the incident, BSP medical staff treated Plaintiff for exposure to oleoresin capsicum spray and noted scratches to his right shoulder and axilla, swelling to his right eyebrow, and abrasions to several fingers on his right hand. (Def. SUMF ¶ 56; Def. Ex. C (Use of Force Subcommittee Review Form, Jan. 14, 2022) (independently recording the same findings).) Plaintiff does not dispute this characterization of the contemporaneous medical findings. A rib x-ray was subsequently ordered on January 10, 2022. (Pl. SDMF ¶ 73.) Plaintiff contends he sustained rib injuries, a right orbital injury, a nasal injury, an abdominal injury, a back injury, and a closed-head injury in the incident. (*Id.* ¶¶ 67–72 (citing Hester Dep. T79:3–T81:13).)

Defendant's evidence, which Plaintiff's counsel does not dispute in the Response to Defendant's Statement of Undisputed Material Facts, is that Plaintiff's medical records reflect no rib fracture until after a subsequent, unrelated physical altercation between Plaintiff and a cellmate on May 8, 2022, and reflect a prior CT scan from November 2021 — predating the incident at issue — relevant to Plaintiff's claimed head injury. (Def. SUMF ¶¶ 58–59, 64–65; Pl. Resp. SUMF ¶¶ 57–65 (agree).)[3] Plaintiff has not offered expert testimony connecting any fracture-level injury to the

[3]The specific radiological findings described in these paragraphs are among the material that has been redacted and filed under seal. (*See supra* note 1.) The Court relies here only on the parties' undisputed characterization that the records do not show a rib fracture prior to the May 8, 2022 altercation and that a relevant head CT predates the January 10, 2022 incident, without reproducing the redacted findings themselves.

January 10, 2022 incident. Separately, and largely undisputed, video from immediately after the incident shows Plaintiff breathing heavily, visibly agitated, and wearing a torn shirt, as described above. (*See supra* Part I.B.4.)

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if the evidence would permit "a reasonable jury to return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party, *id.* at 255, and "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *id.* Judgment is nonetheless warranted where the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where, as here, part of the record consists of video evidence, the Court does not adopt a nonmovant's account if it is "blatantly contradicted by the record, so that no reasonable jury could believe it"; in that circumstance, the Court views the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). That

principle applies with full force only where the footage in fact resolves the disputed point; it does not license a court to credit one party's characterization of ambiguous or incomplete footage over the other's, nor to treat the absence of visual corroboration for a fact as equivalent to visual contradiction of it. The distinction matters here, where the cameras at issue are silent and do not show the interior of Plaintiff's cell.

## III. DISCUSSION

### A. Eighth Amendment and NJCRA Failure-to-Protect Claims (Counts I & II)

New Jersey courts apply the same standard to NJCRA conditions-of-confinement claims brought under Article I, Paragraph 12 of the New Jersey Constitution as federal courts apply to their Eighth Amendment counterparts, and neither party contends otherwise here. *See State v. Suarez*, No. A-4000-19T4, 2020 WL 5949815, at *12 (N.J. Super. Ct. App. Div. Oct. 8, 2020), *certif. denied*, 257 A.3d 674 (N.J. 2021) (Table). The Court accordingly analyzes Counts I and II together under Eighth Amendment standards.

#### 1. *Legal Standard*

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of . . . inmates," *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984), and imposes liability where an official is deliberately indifferent to a substantial risk of serious harm to an inmate's safety, *Farmer v. Brennan*, 511 U.S. 825, 832–34 (1994). To survive summary judgment on such a claim, a plaintiff must adduce evidence sufficient

to permit a reasonable jury to find (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) causation. *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997); *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012). Where, as here, the alleged risk arises from a fellow inmate's violence, deliberate indifference — or, *a fortiori*, intentional facilitation of the assault — may be shown by evidence that a prison official acted with "intentional conduct, deliberate or reckless indifference to the prisoner's safety, or callous disregard." *Davidson v. O'Lone*, 752 F.2d 817, 828 (3d Cir. 1984) (en banc), *aff'd sub nom. Davidson v. Cannon*, 474 U.S. 344 (1986).

Because § 1983 liability is personal, Plaintiff must produce evidence that Officer Gibson, "through [his] own individual actions," violated Plaintiff's rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018) (a § 1983 plaintiff opposing summary judgment must "produce evidence supporting each individual defendant's personal involvement").

***2. Application***

The objective prong is not seriously disputed on this record. It is undisputed that Plaintiff was, in fact, assaulted inside a cell that should have been locked, by three IPs who entered after his door was opened during a window in which he had no authorized reason to be out of his cell; that Plaintiff was choked to the point of unconsciousness during that assault; and that he sustained scratches, abrasions, and

swelling as a result. (*See supra* Part I.B.4, I.B.7.) An inmate's exposure to a physical assault by fellow prisoners inside his own locked cell — including one rendering him unconscious — is, if the surrounding circumstances permit an inference of official facilitation or acquiescence, the kind of "substantial risk of serious harm" the Eighth Amendment addresses. *Farmer*, 511 U.S. at 834.

The subjective prong — whether Officer Gibson was deliberately indifferent to, or intentionally facilitated, that risk — is genuinely disputed. Before turning to that dispute, the Court addresses the admissibility of one category of evidence on which Plaintiff relies. Plaintiff testified that he heard other, unnamed inmates describe a practice in which Officer Gibson selected disfavored inmates to be beaten and used Brown, Lee, and Kareem as his instruments. (Pl. SDMF ¶¶ 28, 30.) Offered to prove that Officer Gibson in fact operated such a scheme, these out-of-court statements are hearsay, Fed. R. Evid. 801(c), 802, and Plaintiff identifies no exception that would render them admissible. Pressed at his deposition on the source of this belief, Plaintiff confirmed it rested on what "other people were saying" and that "all the inmates was saying" Officer Gibson used IPs this way, and when asked whether he had independent knowledge of it, responded only that his "independent knowledge" was of what happened in his own cell on January 10, 2022. (Def. Ex. H at 135:5–138:25, 144:5–144:21.) Plaintiff's interrogatory answers are to the same effect. (Def. Ex. J, Interrog. Resp. No. 23 (Plaintiff "was not present . . . when Officer [Gibson] spoke to or made promises to his 'hit men' inmates," a belief instead reflecting what was

"common knowledge" on the unit).) *See generally Burke v. Powell*, No. 20-1013, 2023 WL 3561345 (D.N.J. May 18, 2023) (declining to consider similar hearsay offered in opposition to summary judgment). The Court accordingly does not rely on this testimony in evaluating whether a genuine dispute exists, and confines its analysis to Plaintiff's admissible, personal-knowledge testimony and the documentary and video record.

That remaining evidence is nonetheless sufficient to create a genuine dispute, though it is more modest than Plaintiff's opposition brief suggests once the video evidence is correctly read. Plaintiff has testified, from personal knowledge, that Officer Gibson responded angrily to his hot dog complaint and ordered him back to his cell; that Officer Gibson thereafter repeatedly told him "I don't like you and I'm going to get you"; that Officer Gibson was at the control panel when the door opened and personally opened it; and that he heard a voice he identified as Officer Gibson's shout encouragement to his attackers during the assault. (*See supra* Part I.B.3–I.B.4.) As explained above, Defendant's video evidence, correctly read against the undisputed offset between the dayroom and tier camera clocks, places Officer Gibson outside the bubble without an accessible control panel at the moment the door actually opened — which cuts against, rather than corroborates, Plaintiff's specific claim that Officer Gibson personally operated the panel at that instant. (*See supra* Part I.B.4.) That same footage does show Officer Gibson cycling back into the booth, with IPs nearby, during other portions of the window in which Lee, Brown, and Kareem were inside Plaintiff's

cell, including in the roughly thirty seconds before Plaintiff and the three IPs emerged. (Def. SUMF ¶¶ 20, 22.) A reasonable jury crediting Plaintiff's testimony regarding Officer Gibson's role in selecting Brown, Lee, and Kareem, his expressed animus, his presence near the booth during significant portions of the relevant window, and the encouragement Plaintiff says he overheard could still find deliberate indifference or, if credited fully, intentional facilitation of the attack — even setting aside the door-opening mechanism itself, as to which the video evidence favors Defendant.

Defendant urges that Plaintiff's account generally is "blatantly contradicted by the record" within the meaning of *Scott v. Harris* and should not be credited at all. (Def. Br. at 8–15; Def. Reply at 1–7.) The Court agrees that the video evidence forecloses one specific component of Plaintiff's account — that Officer Gibson personally operated the control panel at the instant the door opened, discussed above — but disagrees that it forecloses Plaintiff's broader account as a matter of law. The cameras on which Defendant otherwise relies are silent; their failure to show anyone in Officer Gibson's vicinity visibly reacting to a shout is circumstantial evidence that no shout occurred, but it is not the sort of direct, visual contradiction — for example, footage of the very event a witness claims did not happen — that removes a factual question from the jury under *Scott*. *See* 550 U.S. at 378–81 (video directly depicted the manner of the plaintiff's driving, the very conduct in dispute). Nor does any camera capture the interior of Plaintiff's cell, where the assault itself took place. And while the footage undercuts Plaintiff's testimony that Officer Gibson personally pressed the panel to

open the door, that same footage also places Officer Gibson back in or near the booth during other portions of the critical window — a detail that does not affirmatively rule out the broader facilitation Plaintiff describes.

Defendant separately emphasizes that Plaintiff's account has changed over the course of this litigation: Plaintiff's initial SID interview and administrative grievance described an attempted stabbing that he has since abandoned and said nothing about Officer Gibson's presence or statements; his interrogatory answers, served in May 2025 — several months after Plaintiff had obtained counsel — instead stated that Officer Gibson personally appeared at the cell and placed him with the three IPs some ninety minutes before the attack; and only at his deposition three months later did Plaintiff settle on the version now before the Court, that he overheard Officer Gibson from the bubble roughly two minutes beforehand. (*See supra* Part I.B.6.) The Court notes the timing of these shifts — arising, as they did, well into Plaintiff's representation rather than before it — not to cast any aspersion on Plaintiff or his counsel, and not to prejudge a question Rule 56 reserves for the jury, but because candor to the parties requires it: on this record, the inconsistencies may, and the Court posits likely will, affect how a jury weighs Plaintiff's credibility, and the parties would be well served to weigh the strength of Plaintiff's case with that likelihood in mind. That said, they do not permit the Court to resolve the credibility question at this stage. *Anderson*, 477 U.S. at 255. Nor, on this record, are the inconsistencies so extreme or so thoroughly refuted by objective evidence as to render Plaintiff's account incredible as a matter of law: his

testimony regarding Officer Gibson's animus and his selection of Brown, Lee, and Kareem has remained consistent throughout, and the claim that Officer Gibson shouted encouragement during the assault is not the sort a silent, exterior-facing video can conclusively refute, even though that same video undermines the separate claim that Officer Gibson personally opened the door.

The parties' dispute over which shift Officer Gibson worked — material to whether he could have been present for, or provoked by, the hot dog exchange — rests on competing testimony (Officer Gibson's declaration against Plaintiff's deposition testimony) that the Court cannot resolve on this record. (*See supra* Part I.B.1.) That dispute is, in any event, narrower than Defendant's framing suggests: Officer Gibson's declaration establishes his assigned shift and his lack of recollection of working lunch service that day, but an officer's assigned shift does not, without more, foreclose his presence outside it — whether by early arrival, a holdover, or otherwise — and Defendant's evidence does not address that possibility. So too the parties' dispute over whether Officer Gibson selected Brown, Lee, and Kareem for their tier privileges. (*See supra* Part I.B.2.) Each is the kind of swearing contest — or, as to the shift assignment, evidentiary gap — that Rule 56 leaves for trial.

Because genuine disputes of material fact bear directly on whether Officer Gibson was deliberately indifferent to, or intentionally facilitated, a substantial risk of serious harm to Plaintiff, summary judgment is inappropriate on Counts I and II.

Defendant's motion is accordingly **DENIED** as to Plaintiff's Eighth Amendment and NJCRA failure-to-protect claims.

### B. Substantive Due Process Claims Under the Fourteenth Amendment and NJCRA (Counts III & IV)

Defendant separately moves for summary judgment on Plaintiff's substantive due process claims on the ground that they are subsumed by, and duplicative of, his Eighth Amendment claims under the more-specific-provision rule. The Court agrees.

Where "a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). As the Supreme Court has explained in the prison context specifically, the Eighth Amendment, "specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners," such that it "would indeed be surprising" if conduct that "shocks the conscience" in violation of the Fourteenth Amendment were not also punishment "inconsistent with contemporary standards of decency" in violation of the Eighth. *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *see also Graham v. Connor*, 490 U.S. 386, 394–95 (1989).

Plaintiff was, at all relevant times, in the custody of the New Jersey Department of Corrections and housed at BSP, a New Jersey state prison. (Def. SUMF ¶ 1.) Neither party suggests Plaintiff was a pretrial detainee, and both have litigated

Plaintiff's underlying safety claim under Eighth Amendment doctrine throughout — the framework applicable to convicted prisoners — rather than the distinct due process standard that would govern an analogous claim by a pretrial detainee. The conduct underlying his substantive due process claims is identical to the conduct underlying his Eighth Amendment claims: the TAC alleges, in materially identical language, that Officer Gibson's conduct "as aforesaid" violated both provisions. (TAC ¶¶ 25–26, 32–33.) Plaintiff's own opposition brief describes the due process claim as resting on "a liberty interest in bodily security from attack by another prisoner which was instigated by a prison official" — a description that falls squarely within the protection *Farmer*, *Bistrian*, and *Davidson* already extend to convicted prisoners under the Eighth Amendment. (Pl. Opp'n Br. (ECF No. 67) at 7.) Indeed, Plaintiff's own Point I, addressing the Eighth Amendment claim, treats this same conduct as cognizable under that Amendment. (*Id.* at 1–5.) The two positions are difficult to reconcile: if instigating an inmate-on-inmate assault against a convicted prisoner is the sort of conduct the Eighth Amendment reaches — as it plainly is — there is no independent role left for substantive due process to play as to that same conduct.

Plaintiff's own authority illustrates the point. Plaintiff relies on *D'Amico v. Hayman*, Civ. No. 06-3886 (RMB) (AMD), slip op. at 7 (D.N.J. Jan. 12, 2007), for the proposition that intentional harassment of prisoners "cannot be tolerated by a civil society." (Pl. Opp'n Br. at 2.) But *D'Amico* analyzed that proposition under the Eighth Amendment, not substantive due process — as did *Burke*, 2023 WL 3561345, at *8, a

case Defendant cites involving a materially indistinguishable allegation that corrections officers orchestrated an attack on an inmate by directing fellow IPs to carry it out, which this Court analyzed as an Eighth Amendment claim. Plaintiff's reliance on *Hemphill v. Schott*, 141 F.3d 412 (2d Cir. 1998), is inapposite for the same reason: that case addressed a substantive due process claim by an arrestee against police officers who armed a private citizen, a context in which no more specific provision like the Eighth Amendment was available because the plaintiff was not a convicted prisoner. *See id.* at 418–19. Here, by contrast, Plaintiff was a convicted prisoner, and the Eighth Amendment supplies the governing standard for his claim that a corrections officer facilitated an assault upon him.

Because Plaintiff's substantive due process claims arise from the same conduct as, and are subsumed by, his Eighth Amendment claims, Defendant's motion is **GRANTED** as to Counts III and IV, which are dismissed with prejudice.

### C. Qualified Immunity

Officer Gibson also moves for summary judgment on qualified immunity grounds. Qualified immunity shields government officials from liability unless (1) the official violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address either prong first. *Pearson*, 555 U.S. at 236. New Jersey's qualified immunity doctrine

under the NJCRA tracks the federal standard. *Brown v. State*, 165 A.3d 735, 743 (N.J. 2017).

As set forth in Part III.A above, genuine disputes of material fact preclude resolution of the first prong — whether Officer Gibson in fact violated Plaintiff's Eighth Amendment rights — as a matter of law. As to the second prong, the right at issue has been clearly established since at least *Farmer* and long-settled Third Circuit authority: a convicted prisoner's right to be free from a prison official's deliberate indifference to, or intentional facilitation of, a substantial risk of serious harm from a fellow inmate's violence is not a novel proposition, and "[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 449 (3d Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). If the jury credits Plaintiff's version of events — that Officer Gibson selected and empowered Brown, Lee, and Kareem, harbored and voiced animus toward Plaintiff, opened or facilitated the opening of Plaintiff's cell door, and encouraged the ensuing assault — no reasonable officer could have believed that conduct was lawful. Because the constitutional-violation question cannot be resolved on this record, qualified immunity does not entitle Officer Gibson to summary judgment on Counts I and II at this stage. Defendant's motion is accordingly **DENIED** on qualified immunity grounds as to Counts I and II. Given the dismissal of Counts III and IV in Part III.B above, Officer Gibson's qualified immunity argument as to those counts is moot.

**D. Damages**

Finally, Officer Gibson moves to bar Plaintiff's claims for compensatory damages, emotional distress damages, and punitive damages in their entirety, principally on the ground that Plaintiff has not offered expert testimony establishing causation.

Expert testimony is not invariably required to establish an injury's cause; it is unnecessary where, "as a matter of ordinary experience," a particular act might be expected to produce a particular result and that result follows — that is, where the "claimed disability is [a] natural result of the alleged injury." *Bushman v. Halm*, 798 F.2d 651, 658–59 (3d Cir. 1986); *Tormenia v. First Investors Realty Co.*, 251 F.3d 128, 132 (3d Cir. 2000). It is undisputed that Plaintiff sustained scratches, abrasions, and swelling to his eyebrow that same-day treatment attributed to the incident (Def. SUMF ¶ 56; Pl. Resp. SUMF ¶ 56 (agree)), injuries of a kind that require no expert testimony to link to a physical assault. Summary judgment barring compensatory damages in their entirety is therefore unwarranted.

The record stands differently, however, as to Plaintiff's claims that he suffered a rib fracture and a skull or orbital fracture in the incident. Plaintiff's counsel agreed, without qualification, with Defendant's Statement of Undisputed Material Facts on this point: that Plaintiff's medical records show no evidence of a rib fracture until after a subsequent, unrelated altercation with a cellmate in May 2022, and that a relevant CT scan predates the January 10, 2022 incident by roughly two months. (Def. SUMF

¶¶ 58–59, 64–65; Pl. Resp. SUMF ¶¶ 57–65 (agree).) Plaintiff's own contemporaneous grievance following the May 2022 altercation is to the same effect, attributing his claimed rib fracture to that incident specifically. (Def. Ex. E.) Having agreed to the facts that undercut causation for these specific injuries, and having offered no expert testimony to establish it notwithstanding that agreement, Plaintiff cannot carry his burden on this narrow category of claimed injury. Summary judgment is therefore warranted as to any claim for compensatory damages premised specifically on a rib fracture or a skull or orbital fracture attributable to the January 10, 2022 incident, without prejudice to Plaintiff's claim for compensatory damages based on the injuries the contemporaneous medical record does support.

As to emotional distress damages, such damages are recoverable under § 1983 upon a showing of "actual injury," without need for expert testimony. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Bolden v. SEPTA*, 21 F.3d 29, 36 (3d Cir. 1994); *Mitchell v. Horn*, 318 F.3d 523, 533–36 (3d Cir. 2003). Video taken immediately after the incident shows Plaintiff breathing heavily, visibly agitated, and gesturing toward his attackers — evidence a reasonable jury could find sufficient to establish actual injury. (*See supra* Part I.B.4.) Summary judgment is not warranted on this component of damages.

Punitive damages under § 1983 are available against an individual defendant found to have acted with "evil motive or intent," or in reckless or callous disregard of the plaintiff's rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Because a genuine dispute

exists as to whether Officer Gibson intentionally facilitated and encouraged an assault on Plaintiff — conduct that, if credited, would readily satisfy this standard — summary judgment on punitive damages is likewise unwarranted.

Defendant's motion is accordingly **GRANTED IN PART** as to compensatory damages premised on a rib or skull/orbital fracture, and **DENIED IN PART** as to all other components of Plaintiff's damages claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 63) is **GRANTED IN PART and DENIED IN PART**. The motion is **DENIED** as to Plaintiff's Eighth Amendment and NJCRA failure-to-protect claims (Counts I and II) and as to qualified immunity on those claims. The motion is **GRANTED** as to Plaintiff's substantive due process claims under the Fourteenth Amendment and NJCRA (Counts III and IV), which are dismissed with prejudice as subsumed by Counts I and II. The motion is **GRANTED IN PART** and **DENIED IN PART** as to damages, as set forth in Part III.D. An appropriate Order follows.

Dated: **September 29, 2026**

*s/ Renée Marie Bumb*
**Renée Marie Bumb**
**Chief United States District Judge**